Please rise. This court is now in session. Okay, please be seated. And call the next case please. The first case of the afternoon I guess.  My name is Michael Waden and I'm the attorney for Susan Hoover. This is an action by Mrs. Hoover resulting in injuries she received when she entered upon and used an inflatable amusement device. It was an obstacle course. The name of the device was called Chaos. We filed a four count complaint. Counts one, negligence, two premises liability, three. We filed a count on the Carnival Amusement Ride Safety Act which was dismissed by the trial court and was not an issue in this appeal. And then we also filed a count for products like dope. There's three defendants. One is Jus For Fun Inc., the only corporation. The other is PIU Management LLC, which is a California limited liability company. PIU is a franchisor and Jus For Fun Inc. is a franchisee. And they both do business as PIU or Pump It Up Party or Pump It Up. The plaintiff's daughter, oh there was one other defendant, Cutting Edge Creations, which is a manufactured product. They never bothered to appear or file an answer. They were served and we received a default judgment against them and approval. So that's fine. The plaintiff's daughter came to her birthday party, her ninth birthday was coming up, and her daughter wanted to have a birthday party at this business called Pump It Up, which the location is in Orland Park, Illinois. That part of Orland Park was down in Will County. Her daughter had been there to birthday parties for other children. Her mom had picked her up there before. She wanted to have a party there so her mom said she didn't see anything wrong with it. She called, made the arrangements over the telephone, made a $50 deposit. She booked a private party for a little better than 20 people and the party was scheduled for May 11, 2006 at 6 p.m. She made a $50 deposit over the telephone and they got their invitations out and on the day of the party they arrived. She arrived a few minutes early. Some of the children were already there. Others were coming in while she was checking in with the front desk. She checked in and in the meantime the assistants started gathering up the children and putting them in a room to have them watch a safety movie. Now, when she checked in and paid the balance of the fee that was due, $315.86 was the total fee, they had her sign an exculpatory agreement when she checked in. So she didn't bother reading. She just signed it. She didn't ask me to explain it to her. The dollar she had to sign or she couldn't get in the arena where the inflatable equipment was at. So she signed it. The arena assistants, after they gathered up the children in a collecting room and had them watch a video, and then what happens is they take them into Arena A, which has inflatable amusement equipment in it. They stay there for about a half hour. Then they move them over in. There's two arena assistants for each private party group that goes through. Then they take them over into the next arena area, which has more inflatable equipment. Then after they stay there about half an hour and then they take them from there into what they call the party room, which is tables and chairs where they have their food and open their presents. Pump It Up doesn't provide the food. What you do is they order from local pizza houses, which are delivered in and then they disperse it there while you're in their facility. So that was the agreement you made with the Pump It Up. Now, everything went fine until they got into the second arena. The second arena, or Arena B, is where they have this inflatable amusement device called the Chaos Obstacle Course. She was challenged by one of her adult friends who was there, who had her daughter who was there, to go through the obstacle course. But the obstacle course has two entry points. One person goes in from each side and then they see who can get through it first. You can use all kinds of terms to describe that. You can call it racing or competing or whatever. But that's the design of it. That's what it was intended for and that was the purpose of it. She goes, they get the arena assistants, bull wrestling, and start the parties off as they go through. Adults are permitted on this device. It's not against any rules. She went in through the entry point on her side, made a couple of steps. There was a short hill, no more than four feet high. It's inflated. It's a plastic covering, vinyl covering on the whole Chaos Obstacle Course. She goes over the hill, slides down to the back side of the hill into a little pit or trough that's inflated as well. It has an inflated cushion at the bottom and bam, both her ankles snapped. That's as far as she got. The only thing she can remember after laying there was at some point in time, she felt like her feet were enveloped in some kind of fold or wrinkle or material that was the cover for the inflatable machine. Well, that's the occurrence. Now, to the best of her knowledge, information, and belief, she didn't break any rules. She didn't engage in any risky or unpermitted conduct that she knew about, any reckless conduct. She just went over that first little hill, landed in that first cushion, trough, and bam, both her ankles broke. It wasn't any more than four feet high. It wasn't a big slide or anything. She was over that one little hill. Now, the question is, what law is applicable to a circumstance like this? Traditionally, the common law for torts incorporate and uses the common law of contracts when it comes to these exclusionary, exculpatory, waivers, release, whatever you want to call it. Does it, the exculpatory paragraph that she signed when she walked through the door, does that excuse the defendants from owing a duty to her? What duty did they breach? A duty, it depends on which law you apply. Common law, tort negligence, is just ordinary care. Premises liability, ordinary, reasonable care. Approx liability, unreasonable, dangerous product. Okay, so which one of those did they breach? The trial, we allege they breached all three. We had three counts of complaint that was remaining. In the court below, the motion judge dismissed them, holding that our position was that the Article 2A of the Uniform Commercial Code, the leasing article, was applicable to this transaction. And the reason we raised that and argued that before the trial court was because the agreement between the parties appeared to be a bailment lease type of agreement where they weren't buying the product. The sales article, Article 2, certainly didn't apply. But the lease article seems to apply. The definition of a lease, the applicability of Article 2, it says it applies to anything, to any transaction, regardless of form, except a sale. Except what? A sale. That falls under the sales law. But doesn't the UCC apply to goods? Well, yes, that's one of the requirements. But first of all, it applies to any agreement, regardless of the form the transaction takes. Then there has to be a consumer, has to be a consumer transaction, transaction involving an individual who's purchasing for personal, family, and household use, which definitely met the, consistent with the facts in this matter. And then the next thing, it had to be, the consumer transaction had to involve goods. Not the sale of goods, but the lease of goods. Isn't there a problem with the right of possession here? I mean, she had the right to use it, but... How could she use it if she didn't have possession? Could she move it? No, she couldn't move it. Could she deflate it? No, she couldn't move it or deflate it any more than you can move or deflate the stairs coming up to the second floor here. But you use them, hopefully. Well, no, there is a difference. All you have to do is unplug it, and it will deflate. Did she have the right to do that? No, this was a fixed premises. This was a carnival. And it's an amusement device that's permanently attached to a building on the inside of a building. But what is making, you know, when you walk in that, and you get in and you're going through that obstacle course... The agreement was to purchase the right to possess and use the equipment where it was located. Because there's two rooms of inflatable equipment plus the party room. There's no way anyone could purchase all that equipment and move it to their home. Of course there is. It might cost a lot of money. Yeah, it would be horrendously expensive. But the equipment's not designed to do this. It's designed to be located inside as compared to these moon bouncers and things you see out that people rent and put in their backyard. Nothing like that. These are big permanent devices that are located within a building and are attached to the building. Under your theory, would the UCC apply to the lease of an apartment? Well, it's not a consumer good. Oh, there's a dishwasher in there. Have you gotten hurt in the dishwasher or electric unit yourself or the sink? It's real property. The U.S. 2A does not apply to real property unless goods are attached to the real property and it's a combination that's going in. And we also claim that the Landlord-Tenant Act does apply because it excludes, it completely voids transactions where there's a disqualification agreement. And it was the use of real estate as well as the goods that were permanently attached to real estate, no matter how you get around that point. Thank you. Okay. Mr. Wooden. Mr. Nanny. Yes. Mr. Cork. Counsel. Good afternoon. I represent two of the defendants, Just for Fund Incorporated and PIU Management. We have talked, the briefs discussed at length, and we raised it a little bit in Mr. Wooden's presentation, of this exculpatory agreement. The exculpatory agreement is rather brief. It's less than a page long, consisting of four paragraphs. There are a couple points contained that I think are worth mentioning at the outset. First of all, it begins with, in consideration of being allowed to enter into the play area and or participate in any party or program. So that's what Mrs. Hoover is getting, the right to enter into the premises and participate in these activities. And then later, the document says, I am aware, this is what she signed, I am aware that there is a risk of injury from the inflatable equipment. So, right there, she acknowledges that there is a risk from using this inflatable equipment. We know that she didn't read the document, Mr. Wooden just said she didn't bother reading it, but she signed it and she saw those contents and we cite the law in that respect. The arguments made are a number of arguments that are kind of all out there. The first argument that we talked about a little bit ago was the UCC. Your Honor, touched upon, there is no transfer of the right of possession here. This is an inflatable, substantial sized thing, it's too bad we don't have an exemplar here, but it's primarily attached and mounted in the building. It can't be moved, it can't be inflated, it can't be deflated. Mrs. Hoover can't bring it anywhere. It has to stay where it is. What she gets is the right to go and use it for a certain amount of time. There's no lease agreement here. The only piece of paper existing between the plaintiff and these defendants is the exculpatory agreement. There's no lease talking about the amount of money to be paid, who the lessor is, who the lessee is, the term of the lease, what the subject of the lease is. None of that is here. All we have is an exculpatory agreement. The idea that UCC lease of goods provision applies is just wrong. If I go up to Soldier Field or Wrigley Field or Sox Park and buy a ticket to a ball game and sit in my seat, I don't have possession of that seat, I have the license to use it for the duration of the game. And that's what we have here. She has a license to use this equipment for however long the party lasts. The Landlord-Tenant Act is also raised in the brief, and it fails for a couple of reasons. Number one, again, there's no lease agreement between the parties. There's no, you know, you talk about the Landlord-Tenant Act applies to lease or sale of real property, lease of real property, excuse me. There's no description of real property here. There's no leasehold, no terminal leasehold. Money, how much money is to be paid, who the lessor is, who the lessee is. Any of that is not here. I think it's also worth pointing out, and I probably should have done it earlier, that Mr. Witt in his brief admits that for the first two propositions, that is that the UCC lease of goods provision and the Landlord-Tenant Act apply here so as to vitiate this scope agreement. He says, right in the brief, that there is no authority in Illinois supporting these propositions. There is additional discussion in the brief about the terms of the lease itself, and I think if I can boil it down to three points, the claim is that it does not specifically reference the type of injury that happened here. The second point is that it does not specifically reference that the owner here, the two defendants here are being released for their own negligence, and then the third of the plaintiffs says, excuse me, that the lease is unconscionable. And there is ample Illinois case law where exculpatory agreements in documents other than a landlord lease or real estate agreements in perhaps UCC, although there's no case law in that regard, that these types of agreements are valid and enforceable as long as they advise the person signing. Sorry about that. Some idea of what the potential cause of injury may be, and at the beginning when I said that Ms. Hoover signed a document that says, I'm aware that there's a risk of injury from the inflatable equipment, that's exactly what happened here. She was using the inflatable equipment, one particular item called the chaos obstacle course, when the accident occurred. That specifically is referenced in this exculpatory agreement. Who named it chaos? Pardon me? Just out of curiosity, who named it chaos? I couldn't tell you that. That's the trade name I think of the thing. It's kind of a weird looking thing to be honest with you. Maybe I misunderstood during counsel's presentation, but I thought I heard him say that the Carnival Rides and Amusement Safety Act was not part of this appeal, and if I misunderstood, I apologize, but I thought that's what he said. We did brief it, and it's contained in both his brief and my brief. If I misunderstood it, and it is being presented, that particular act does not allow for a private cause of action. I went into a little bit of detail saying what it does apply to. It allows for inspections and licensing of these sorts of rides and amusement facilities. It doesn't allow injured people to have a cause of action to collect for their injuries. There also is a claim that there's a products liability action being brought here, and that an exculpatory provision cannot be enforced in light of its products liability action. The whole motion that a products liability action is being made here is problematical. The products count was originally pleaded, but when we argued the initial summary judgment motion back in April 2011, counsel said, no, I'm not bringing that cause of action. It's not directed against you people. So from that point on, we proceeded under the guise, under the notion, that there was no products. I went into, hopefully, sufficient detail about the history of the case, because it's kind of muddled, and I can understand that, but the admission was made that this was not a products liability action. In April of 2011, and then throughout the briefing of the motions to reconsider, it was mentioned, but not discussed. Let's just pretend it is out there. What was the evidence presented that the product was unreasonably dangerous? Well, there was none. So what's the difference, whether it's there or not? Well, I understand, but there was no evidence that the product was unreasonably dangerous. I cited Ms. Hoover's deposition testimony in the brief, and she's asked, how did your accident happen? I don't know. Obviously, there's been no expert testimony concerning any design defect or any malfunction of the obstacle course. All we have is Ms. Hoover saying, I was injured on the thing, therefore, there's something wrong with it, in so many words. I think that's a fair summary of her testimony. But, again, I think that the whole concept of the product, there is a products liability action here. I think if there were, at one point, a products liability count, that was waived during all the briefing. I didn't go into a lot of detail in laying out the procedural history of that. Good afternoon. Thank you. Mr. Whitten, some rebuttal? Oh, yes, Your Honor. I'm not as slick as my younger and esteemed counsel is. I apologize. That's all right. The assumption of risk. He read off the document to you. It's an important document. But what did you assume? What risk did you assume? It's a generic statement. You agreed to assume all such, quote, unquote, risk. Well, what were they? What risk did you agree to assume? It doesn't explain. It doesn't say. And that gets into the common law argument. What's the difference between applying the common law and the UCC in this transaction? This was a summary judgment, right? Yes. Okay. Let me ask you. What was the evidence that the defendants were negligent? Where was the evidence that they were negligent? The ‑‑ we relied upon Ray Sips Lockwooder, raised it and played it in our complaint. As you know, it's not a separate cause of action. But it was one of the theories we were relying upon. We couldn't prove what was ‑‑ they had done wrong until we got the records. And we never got those records, so we can, you know, that never happened. Those were just things we would have to deal with once we got into the trial court. But there was also no evidence that they had complied with the rules and regulations for improper installation. First of all, what is in the record just shows that the manufacturer of the product shipped it directly to the homeowner who, I mean, to the business owner who was neophyte and never been involved in this business before, and he had to install it himself. It's a husband and wife thing. So that in and of itself to me is a good indication that something very well could have happened when the product was being installed. Was there an allegation about a defective installation? It's alleged in alternative in the complaint, yes. It's a verified complaint, and we did allege that. That it was defectively installed. Yes. And defectively installed, defectively maintained, and that the staff employees were not trained properly as required by the Carnival and Music Project. What I'm asking is what was the specific defect in the installation? Somehow the material in that fabric got tangled up in this lady's feet when she went down into that cushioned pit, trough. What was the specific about the defective installation? Pardon? I know there was a conclusion. What was the specific defective installation? Well, we had no expert opinion on that. Well, when you're facing summary judgment, you've got to come forward with some evidence. There was no expert opinion on either side. Now, the difference between, if I could, not to interrupt you, but get back to Commonwealth Contract Law versus UCC, is the difference of the burden of proof. Under the UCC, there's a prima facie presumption that it's an unconscionable exclusion, prima facie presumed to be unconscionable when it involves a consumer good and an injury to the person of the consumer. Conversely, now that presumption under the UCC 2A leases can be rebutted. However, under the common law, it is the plaintiff that has to move forward with the burden of proof on the issue of unconscionableness. I'll stay one minute. The, Mr., my opponent is exactly right. I am not alleging that there is private cause of action under the Commonwealth Rights and Amusement Act. I'm alleging that there's public policy created in that act and that either on common law or under lease article, unconscionability involves consideration of public policy. And that's one of, that's the public policy in that act, public policy also in the Landlord-Tenant Act, public policy regarding unconscionableness. Well, usually the unconscionability of an exculpatory cause is if it exculpates someone for their own negligence. That's correct. But, so, if that were the case, what's the evidence, again, that these people, the defendants, were negligent? They broke both my client's ankles. Well, that would make them, in fact, your client got hurt. And we know that the premises owner is not the insurer of the safety of all who come, correct? No. And so, and you still, just, I got hurt on their property, doesn't beat the bulldog, right? You got to, you got to, you got to show that they did something negligent. Raise if so often. Well, that was a flower barrel falling out of a second-story roof, wasn't it? I think so, Your Honor, but it's still a principle, and in a circumstance as in this matter, it's a very important principle of law that has a lot of logic in relation and goes back many years. Are you aware of any case of like-kind nature where they applied the opposite to that situation? A situation like that? Yeah. No. Thank you. Okay, well, thank you both for your arguments here this afternoon. The matter will be taken under advisement. Written disposition will be issued right now. Court will be in brief recess for panel change for the next case. Court is now in recess.